# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CHRISTINE PEREA,**

       **Plaintiff,**

    **vs.**                              **Civ. No. 17-401  KK**

**NANCY A. BERRYHILL, Acting**
**Commissioner of Social Security,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed July 7, 2017, in support of Plaintiff Christine Perea's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.  On August 30, 2017, Plaintiff filed her Motion to Reverse or Remand and Memorandum Brief in Support ("Motion").  (Docs. 19, 20.)  The Commissioner filed a Response in opposition on November 6, 2017 (Doc. 22), and Plaintiff filed a Reply on November 14, 2017.  (Doc. 23.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 6, 8, 9.)

# I. Background and Procedural Record

Claimant Christine Perea ("Ms. Perea") alleges that she became disabled on November 4, 2013,[2] at the age of forty-four because of posttraumatic stress syndrome ("PTSD"), bipolar disorder, arthritis, and back problems. (Tr. 210, 214.[3]) Ms. Perea completed the tenth grade in 2004, and has worked as a variety store cashier, club dancer, restaurant hostess, house cleaner, and gift shop sales associate. (Tr. 215, 221-31, 235-40.) Ms. Perea reported she stopped working on November 22, 2008, due to her medical conditions. (Tr. 214.)

On November 7, 2013, Ms. Perea filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 191-96.) Ms. Perea's application was initially denied on March 12, 2014. (Tr. 66-76, 77, 92-95.) It was denied again at reconsideration on August 8, 2014. (Tr. 78-90, 91, 102-06.) On August 15, 2014, Ms. Perea requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 108-09.) The ALJ conducted a hearing on November 12, 2015. (Tr. 29-65.) Ms. Perea appeared in person at the hearing with attorney representative Barbara Jarvis. (*Id*.) The ALJ took testimony from Ms. Perea (Tr. 33-58), and an impartial vocational expert ("VE"), Pamela Bowman (Tr. 58-64). On December 17, 2015, ALJ Myriam C. Fernandez Rice issued an unfavorable decision. (Tr. 9-23.) On March 17, 2017, the Appeals Council issued its decision denying Ms. Perea's request

---

[2] Ms. Perea initially alleged an onset date of December 12, 2012. (Tr. 191.) At the Administrative Hearing, however, she represented that she was amending her onset date to "November 2013," the date she filed her application. (Tr. 32.) The ALJ's determination indicates an application date of November 4, 2013 (Tr. 12); the Commissioner indicates an application date of November 12, 2013 (Doc. 22 at 1); the Application Summary for Supplemental Security Income indicates a filing date of November 7, 2013 (Tr. 191-96). "Under title XVI, there is no retroactivity of payment. Supplemental security income (SSI) payments are prorated for the first month for which eligibility is established after application and after a period of ineligibility." SSR 83-20, 1983 WL 31249, at *1.

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on July 7, 2017.

for review and upholding the ALJ's final decision. (Tr. 1-6.) On April 3, 2017, Ms. Perea

timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income

disability benefits for adult individuals). The Social Security Commissioner has adopted the

familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria

as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*,

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.     Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004);

*Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. Analysis

The ALJ made her decision that Ms. Perea was not disabled at step five of the sequential evaluation. (Tr. 22-23.) Specifically, the ALJ determined that Ms. Perea had not engaged in substantial gainful activity since November 4, 2013. (Tr. 14.) She found that Ms. Perea had the following severe impairments: migraine headaches, degenerative disc disease, arthritis, borderline personality disorder, posttraumatic stress disorder, bipolar disorder, depression and alcoholism. (*Id.*) The ALJ also found that Ms. Perea had nonsevere impairments of hip and knee pain. (*Id.*) The ALJ determined, however, that Ms. Perea's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 15-17.) As a

result, the ALJ proceeded to step four and found that Ms. Perea had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except:

> the claimant may never climb ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional crouching, kneeling or crawling; she must avoid concentrated exposure to moving machinery or exposure to heights; she can maintain, understand and remember simple work instructions with only occasional changes in work setting and only occasional interaction with the public and co-workers.

(Tr. 17-18.)  The ALJ then determined at step five that considering Ms. Perea's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could perform.  (Tr. 22-23.)

In support of her Motion, Ms. Perea argues that (1) the ALJ failed to assign proper weight to the medical source opinions; (2) the ALJ erred in her analysis under the mental Listings of Impairments; and (3) the ALJ failed to meet her burden at step five.  (Doc. 20 at 9-20.)  For the reasons discussed below, the Court finds that the ALJ failed to properly weigh the medical source opinion evidence and this case requires remand.

## A.     Physical Impairment Medical Opinion Evidence

### 1.     State Agency Examining Medical Consultant Scott Evans, M.D.

On February 17, 2014, Ms. Perea presented to Scott Evans, M.D., on a referral from the Disability Determination Services for a medical consultative exam.  (Tr. 477-81.)  Ms. Perea reported her chief complaints as (1) low back pain, with numbness to the right lower extremity posteriorly, extending past the knees and down to the ankles; and (2) posttraumatic stress disorder.  (Tr. 477.)  Ms. Perea stated she underwent local cortisone injections for her back pain, but that they provided only a few days of relief before the pain returned.  (*Id.*)  She reported that (1) she could dress herself most of the time; (2) could feed herself; (3) did not drive due to back

spasms; and (4) could cook, shop and clean at home, although her boyfriend did chores that involved sweeping, mopping, vacuuming, dishes, laundry, and mowing the grass. (Tr. 477-78.) Ms. Perea reported that she avoided activities that required any bending of her low back. (Tr. 478.) Ms. Perea stated that she was able to (1) stand for a total of two hours on a good day and one hour on a typical day; (2) walk approximately 42-50 feet on level ground; (3) sit in 20-45 minute intervals without needing to stand or lie down; and (4) could lift eight pounds. (Tr. 477-78.) She stated she was unable to sit through an entire movie. (Tr. 478.) On clinical exam, Dr. Evans noted that Ms. Perea ambulated with a slow gait and took a significant amount of time to get on and off the exam table and in and out of the chair, although she undressed and dressed appropriately in adequate time. (Tr. 479.) Dr. Evans also noted that Ms. Perea appeared to give a decreased effort throughout some portions of the clinical exam. (*Id.*) Dr. Evans' findings included, *inter alia*, a loss of lumbar lordosis appreciated, and that Ms. Perea appeared to be somewhat hypersensitive to moderate touch in the lumbar spine region, as well as the sciatic right buttock region. (Tr. 481.) Dr. Evans noted in his functional assessment that Ms. Perea's symptoms appeared to be somewhat exaggerated and that she did not appear to give a full effort on some of the exam findings. (*Id.*) Dr. Evans nonetheless adopted some of Ms. Perea's reported functional limitations and assessed that in an eight hour work day she could (1) stand for approximately 2 hours, (2) walk for one hour, and (3) sit for two hours. (*Id.*) Dr. Evans further assessed that Ms. Perea could lift approximately eight pounds regularly and fifteen pounds occasionally. (*Id.*)

The ALJ accorded Dr. Evans' opinion partial weight. (Tr. 20.)

### 2. State Agency Nonexamining Medical Consultant Nancy Armstrong, M.D.

On March 12, 2014, State agency nonexamining medical consultant Nancy Armstrong, M.D., reviewed the available medical evidence record[5] and assessed that Ms. Perea was capable of a full range of medium work,[6] except that she should avoid concentrated exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc.," due to a history of reactive airway disease. (Tr. 71-73.) Dr. Armstrong explained that she considered Dr. Evans' assessment, but believed that he had overstated Ms. Perea's limitations and that his assessment was not supported by his exam findings. (*Id.*)

The ALJ accorded Dr. Armstrong's opinion partial weight. (Tr. 20.)

### 3. State Agency Nonexamining Medical Consultant Karine Lancaster, M.D.

On August 7, 2014, State agency nonexamining medical consultant Karine Lancaster, M.D., reviewed the available medical evidence record at reconsideration.[7] (Tr. 85-87.) Dr. Lancaster explained that the evidence did not show a significant change to Ms. Perea's physical condition and she affirmed Dr. Armstrong's initial assessment for medium work as written. (*Id.*)

The ALJ accorded Dr. Lancaster's opinion partial weight. (Tr. 20.)

---

[5] Dr. Armstrong reviewed lumber spine radiologic studies performed on February 6, 2014 (Tr. 475), and Dr. Evans' February 17, 2014, consultative exam (Tr. 477-81). (Tr. 73.)

[6] "The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. . . ." SSR 83-10, 1983 WL 31251, at *6.

[7] Dr. Lancaster reviewed lumber spine radiologic studies performed on February 6, 2014 (Tr. 475); Dr. Evans' February 17, 2014, consultative exam (Tr. 477-81); and an internal medicine note prepared by Kenneth Yamamoto, M.D., of First Choice Community Healthcare (Tr. 630-31). (Tr. 87.)

4.    **Steven Hartman, M.D.**

On October 31, 2014, Ms. Perea saw Steven Hartman, M.D., at El Pueblo Health Services, with chief complaints of right hip pain and left leg pain. (Tr. 624-25.) On physical exam, Dr. Hartman noted lumbosacral tender to palpation left greater than right; negative straight leg raise for impingement, but painful in lumbar spine bilaterally; and paraspinous tender to palpation in cervical and thoracic spine. (Tr. 625.) Dr. Hartman assessed lumbago, and planned to refer Ms. Perea for radiographic studies. (*Id.*)

Ms. Perea saw Dr. Hartman eight more times over the next eight months. On December 22, 2014, she saw Dr. Hartman for an acute care visit related to headache and dizziness. (Tr. 621-23.) On January 21, 2015, Ms. Perea presented for an annual adult physical. (Tr. 617-19.) On March 3, 2015, Ms. Perea saw Dr. Hartman for follow up on her Lumber Spine MRI.[8] (Tr. 615-16.) Dr. Hartman discussed physical therapy, potential future spinal injections, or surgery if ever indicated. (Tr. 616.) He referred Ms. Perea for physical therapy.[9] (*Id.*) On April 20, 2015, Ms. Perea saw Dr. Hartman in follow up after a recent motorcycle accident for which she had been hospitalized for three days.[10] (Tr. 613-14.) Dr. Hartman assessed knee sprain and abrasion, head abrasions, and possible reinjury of knee ligaments. (Tr. 614.) On April 28, 2015, Ms. Perea saw Dr. Hartman in follow up for her motorcycle accident, and noted musculoskeletal pain "localized to one or more joints R knee, lower back with chronic pain,

---

[8] January 16, 2015, Lumber Spine MRI demonstrated "[d]egenerative changes predominately at L5/S1 level resulting in minimal spinal canal narrowing and mild right neural foraminal narrowing with contact upon the exiting right L5 nerve root." (Tr. 686-87.)

[9] Ms. Perea attended seven physical therapy sessions for left knee and back pain from March 18, 2015, through April 7, 2015. (Tr. 548, 549-50, 552, 553, 554, 555, 556-57.)

[10] On April 11, 2015, Ms. Perea was in a motorcycle accident and suffered injuries to her face, head, left elbow, and right shoulder. (Tr. 567.) Ms. Perea was admitted with a diagnosis of pulmonary contusion. (*Id.*) She was discharged on April 14, 2015. (Tr. 587.)

exacerbated by prolonged sitting, standing or walking." (Tr. 636-37.) On May 12, 2015, Ms. Perea saw Dr. Hartman for headaches. (Tr. 639-41.) Dr. Hartman noted neck and upper back pain/tension and administered trigger point injections. (*Id.*) On June 11, 2015, Ms. Perea followed up with Dr. Hartman for upper back and neck pain. (Tr. 611-12.) Dr. Hartman assessed muscle spasm and administered trigger point injections. (Tr. 612.) Dr. Hartman also prescribed Methocarbamol. (*Id.*) On August 10, 2015, Ms. Perea saw Dr. Hartman with complaints of lower back pain, and left shoulder pain related to a fall one month earlier. (Tr. 608-09.) Ms. Perea reported that certain positions made her back pain worse and that walking caused radiating pain into her right leg. (Tr. 608.) Dr. Hartman assessed arthropathy and muscle spasm. (Tr. 609.) He administered trigger point injections for Ms. Perea's back pain, and referred her for a shoulder MRI. (*Id.*)

On April 28, 2015, Dr. Hartman prepared a *Physician's Questionnaire* on Ms. Perea's behalf. (Tr. 602-06.) Dr. Hartman noted (1) the dates on which he had treated Ms. Perea;[11] (2) her diagnoses;[12] (3) the objective bases for her diagnoses;[13] (4) the treatment provided and referred;[14] (5) prescribed medications;[15] and (6) his recommendation and treatment plans.[16] (Tr. 602.) Dr. Hartman assessed that during an eight-hour workday, Ms. Perea would (1) require fifteen minute breaks less than every two hours; (2) that she was only capable of working four

___

[11] Dr. Hartman noted treatment dates on October 1, 2014, October 31, 2014, December 22, 2014, January 21, 2015, March 3, 2015, April 20, 2015, and April 28, 2015. (Tr. 602.)

[12] Dr. Hartman noted migraines, hypertension, degenerative disc disease of spine, left knee arthropathy, and PTSD. (Tr. 602.)

[13] Dr. Hartman noted MRI/xrays of spine demonstrating degenerative changes. (Tr. 602.)

[14] Dr. Hartman noted medication management for pain/muscle spasms; referral to physical therapy; and referral to Valle Del Sol for counseling. (Tr. 602.)

[15] Dr. Hartman noted Methocarbamol and Gabapentin. (Tr. 602.)

[16] Dr. Hartman noted continued physical therapy treatments and continued counseling/psychiatric care. (Tr. 602.)

hours a day, three to five days a week; and (3) that she would miss two to four days of work per month due to her conditions. (Tr. 603.) He further assessed that Ms. Perea (1) could sit, stand or walk for less than one hour at one time; (2) could sit for a total of four hours; (3) could stand for a total of two hours; (4) could walk for a total of one hour; (5) could occasionally lift or carry up to five pounds; (6) could continuously use her hands; (7) could not use her feet for repetitive motions; (8) could never bend, squat, or crawl; (9) could occasionally climb a few steps and reach; and (10) was restricted from activities involving unprotected heights, being around moving machinery, exposure to marked changes of temperature and humidity, driving automotive equipment, and exposure to dust, fumes and gases. (Tr. 605.)

The ALJ accorded Dr. Hartman's opinion little weight. (Tr. 20.)

**B.** **The ALJ Failed To Properly Weigh the Medical Source Opinion Evidence Related to Ms. Perea's Physical Impairments**

Ms. Perea argues generally that the ALJ failed to properly weigh the medical source opinion evidence. (Doc. 20 at 9-14.) Specifically, Ms. Perea argues that the ALJ failed to consider that the State agency nonexamining medical consultant assessments were made based on limited evidence. (*Id.* at 13-14.) She further argues that in rejecting Dr. Hartman's opinion, the ALJ cited to no specific inconsistent evidence and failed to provide any legitimate basis for discrediting his findings. (*Id.* at 10.) The Commissioner argues that the ALJ properly evaluated the medical opinion evidence and reasonably determined that Ms. Perea was capable of unskilled light work. (Doc. 22 at 12-21.)

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215. Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996

WL 374183 at *5.[17]  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion."  *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[18]  An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for controlling weight.  *Langley*, 373 F.3d at 1119 (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).  Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the [regulatory] factors."  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions."  SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

Here, the ALJ failed to properly weigh the medical source opinion evidence related to Ms. Perea's physical impairments as discussed below.

---

[17]  The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017.  82 Fed. Reg. 5844, 5845, 5867, 5869.

[18]  These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

### 1. Dr. Evans

In according partial weight to Dr. Evans' opinion, the ALJ explained, on the one hand, that she found Dr. Evans' report "reasonable," and that she assessed an RFC consistent with light work.[19]  (Tr. 20.)  The ALJ explained, on the other hand, without more, that certain of Dr. Evans' remarks were not supported by evidence in the record.  (*Id.*)  The ALJ's explanation, however, is both unclear and confusing because the ALJ's RFC assessment for light work is *inconsistent* with *all* of Dr. Evans' functional limitations; *i.e.,* that Ms. Perea could (1) stand for a total of two hours; (2) walk for one hour; (3) sit for two hours; and (4) lift eight pounds regularly and fifteen pounds occasionally.[20]  (Tr. 481.)  In other words, the ALJ implicitly rejected all of Dr. Evans' assessed functional limitations even though she purported to find it "reasonable," to accord it partial weight, and to rely on it to support her RFC determination for light work.  The ALJ erred both in failing to make clear to the Court the reasons for the weight she accorded Dr. Evans' opinion and in assessing an RFC that is wholly inconsistent with his opinion to which she purportedly assigned some weight.

### 2. Dr. Armstrong and Dr. Lancaster

In according partial weight to the State agency nonexamining medical assessments, the ALJ explained that Dr. Armstrong's and Dr. Lancaster's assessments were reliable because they had reviewed the record, including claimant's statements regarding her daily activities, and their assessments were consistent with the record as a whole.  (Tr. 20.)  However, Dr. Armstrong and Dr. Lancaster listed the medical record evidence they reviewed in preparing their assessments

---

[19] "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing. . . ." SSR 83-10, 1983 WL 31251, at *5.

[20] *See* Section III.A.1., *supra*.

and it is clear from this listing that their record review was incomplete and minimal.[21]  Moreover, contrary to the ALJ's representation, neither of these State agency consultants listed or referenced their reliance on Ms. Perea's statements regarding her daily activities.[22]  (*See* Tr. 73, 87.)  The ALJ's explanation is further deficient because she failed to point to any evidence to support how these nonexamining medical assessments were consistent with the record as a whole.  In fact, the only other medical source opinion evidence in the record related to Ms. Perea's physical impairments; *i.e.,* Dr. Evans' assessment and Dr. Hartman's assessment, is inconsistent with, and fails to support Dr. Armstrong's and Dr. Lancaster's assessments that Ms. Perea was capable of performing medium work.  The opinions of Dr. Evans, as an examining source, and Dr. Hartman, as a treating source, would also generally be entitled to more weight than those of these non-examining medical consultants.  *Robinson*, 366 F.3d at 1084 (explaining that the opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all).

Although the ALJ somewhat tempered Dr. Armstrong's and Dr. Lancaster's assessments to Ms. Perea's benefit,[23] the ALJ's explanation for according partial weight to these assessments is nonetheless not supported by substantial evidence.  Additionally, because the other medical source opinion evidence support even greater exertional restrictions than the ALJ ultimately

---

[21] *See* fn. 5 and 7, *supra.*

[22] On December 6, 2013, Ms. Perea completed an Adult Function Report that was part of the record evidence at the time Dr. Armstrong and Dr. Lancaster assessed her RFC.  (Tr. 244-51.)  She reported therein, *inter alia*, that she cannot be in crowds, only shops with a friend late at night when very few people are around, is able to do some laundry and dishes, does not drive, and can walk 50 yards before needing to rest.  (*Id.*) The State agency nonexamining medical consultants' assessments are, therefore, inconsistent with Ms. Perea's reported activities of daily living.

[23] *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit).

assessed, the ALJ's error in failing to properly weigh the State agency nonexamining medical opinion evidence is not harmless. *See Allen v. Barnhart*, 357 F.3d 1140, 1156 (10th Cir. 2004) (a determination of harmless error may be appropriate "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way").

### 3.    Dr. Hartman

The ALJ accorded little weight to Dr. Hartman's treating physician opinion, effectively rejecting it.[24]  When properly rejecting a treating physician's opinion, an ALJ must follow two steps.  *Langley*, 373 F.3d at 1119.  First, the ALJ must first determine whether the opinion qualifies for "controlling weight."  *Id.*  To do so, the ALJ must consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  If the answer is "no," the inquiry ends.  *Id.*  If the opinion is well supported, the ALJ must then determine if it is consistent with other substantial evidence in the record.  *Id.*  If the opinion is deficient in either of these respects, the opinion is not entitled to controlling weight.  *Id.*  However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the relevant regulatory factors.  *Id.*

Here, the ALJ recited the proper legal standard for weighing treating physician opinion evidence (Tr. 20), but did little else to demonstrate she properly applied it in evaluating and weighing Dr. Hartman's opinion.  First, the ALJ failed to determine whether Dr. Hartman's opinion was well supported.  Dr. Hartman expressly noted in his *Physician's Questionnaire* the bases for his opinion, including objective findings.  (Tr. 602.)  The ALJ failed to discuss these

---

[24] *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (according little weight to an opinion is effectively rejecting it).

bases, all of which squarely addressed certain of the regulatory factors the ALJ should have considered; *i.e.,* (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; and (3) the degree to which the physician's opinion is supported by relevant evidence. 20 C.F.R. 416.927(c)(1)-(3). Second, having bypassed the first step altogether, the ALJ then effectively rejected Dr. Hartman's opinion without any consideration of what lesser weight the opinion should be given in light of the relevant regulatory factors. *Langley*, 373 F.3d at 1120. This is error.

The ALJ's proffered explanations for rejecting Dr. Hartman's opinion are also not supported by substantial evidence. The ALJ explained that elsewhere in her determination she found Ms. Perea was not credible, that Ms. Perea's subjective complaints reported to Dr. Hartman were unreliable, and that Dr. Hartman's findings were inconsistent with Ms. Perea's activities of daily living. (Tr. 20.) Having found a claimant not credible, an ALJ can properly discount a physician's findings to the extent they are based only on what a claimant told that provider. *Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished). But an ALJ cannot reject *objective* findings on this basis. *Id.* The ALJ improperly did so here.

The ALJ's reliance on Ms. Perea's "daily" activities is also suspect because she ignored the full context of Ms. Perea's *typical* daily activities. *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (finding that sporadic performance of activities of daily living does not establish that a person is capable of engaging in substantial gainful activity). For instance, in her determination, the ALJ states that "claimant reported that she enjoys outdoor activities, going

to church, cooking, traveling, holiday celebrations, eating out, sports and talking." (Tr. 16.) However, the ALJ excerpted that information from a mental health clinical intake assessment generated when Ms. Perea was seeking mental health care for posttraumatic stress disorder and depression, and asked generally about her "recreational activities and interests." (Tr. 439-49.) Despite Ms. Perea's expressed interests, that same intake assessment described Ms. Perea as socially isolated; described her emotional behavioral problems as, *inter alia*, violent temper (currently on probation for domestic violence against her partner), self-injurious acts (cutting), self-injurious threats (recently overdosed on partner's medications), and hostile/angry mood; and noted that she was dependent on others for housing and would be "poverty stricken" without her partner who was always threatening to call the police on her. (*Id.,* Tr. 410.) That particular intake also indicated an Axis I diagnoses of PTSD and Bipolar I Disorder, and an assessed GAF score of 54.[25] (Tr. 447.) The ALJ also noted elsewhere in her determination that Ms. Perea reported riding a motorcycle and getting out of the house, and reported doing vigorous housework at home including moving furniture. (Tr. 18.) The full context of the record on which these findings were derived, however, demonstrates that Ms. Perea reported to State agency examining psychological consultant Thomas P. Dhanens, Ph.D., that she cannot do much physically because of arthritis in her back, (Tr. 485); that "[s]he said she goes to church and reads the Bible and does whatever chores she can. . . . [S]he does not like to go out in public. She does like to ride on [her boyfriend's] motorcycle [although it leads to increased pain]" (*Id.,* Tr. 632); and that when she "*gets manic,*" she "can't stop [her]self" from "rearranging the furniture and closets, doing laundry and dishes and vacuuming," despite her arthritis and back

---

[25] A GAF score of 51-60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

problems. (*Id.*) (Emphasis added.) Ms. Perea reported to Dr. Evans that she does not drive due to back spasms, avoids activities that require any bending, and that her boyfriend does the household chores that involve sweeping, mopping, vacuuming, dishes, laundry and mowing the grass. (Tr. 478.) Ms. Perea similarly reported in her Function Report and testified at the Administrative Hearing that her ability to do household and yardwork is limited by a lack of concentration and back and knee pain, and that she does not drive and goes out infrequently. (Tr. 38-39, 57, 246-47.) The ALJ clearly failed to properly consider Ms. Perea's activities of daily living in their full context.

For all of the foregoing reasons, the ALJ failed to properly evaluate and weigh the medical source opinion evidence related to Ms. Perea's physical impairments.

### C. Mental Impairment Medical Opinion Evidence

#### 1. State Agency Examining Psychological Consultant Thomas P. Dhanens, Ph.D.

On March 3, 2014, Ms. Perea presented to Thomas P. Dhanens, Ph.D., on a referral from the Disability Determination Services for a mental status consultative exam. (Tr. 483-87.) Dr. Dhanens noted Ms. Perea's family, social, employment and psychiatric histories. (Tr. 483-85.) In particular, Dr. Dhanens noted Ms. Perea's reported mental, physical and sexual abuse related to her relationships, her self-harming behaviors; *i.e.,* alcohol abuse, suicide attempt, and cutting, and her various diagnoses. (Tr. 483-84.) Dr. Dhanens performed a mental status exam. (Tr. 485-86.) His impression was that

> [t]his claimant has very significant characterological problems, at least. She has a history of victimization/abuse by her first husband. But, she went on to have numerous relationships and seven children, none of whom are in her custody. In later relationships, she acknowledges being sometimes provocative, hostile, "mean."

> I have no doubt there is significant mood disorder and behavioral acting-out. However the correct diagnosis is uncertain. She reports multiple symptoms of multiple conditions and has been diagnosed with various labels in the past. In addition to PTSD, she also claims Bipolar disorder and OCD symptoms. Historically she reports dissociative episodes. She reports self-cutting. She reports binge drinking.
>
> The claimant gave a disjointed [] history of a tumultuous, unstable adult life. I believe some of [the] reports are valid since they are consistent with the record. I questioned whether all of the reports are valid.
>
> In terms of documentation, I did receive records from a hospitalization last year, following an impulsive suicide gesture, but not current treatment records, or even documentation of current treatment involvement. She states she is currently under psychiatric care, taking psychotropic medication. But she also said antidepressants, Zoloft for example, "did nothing" and she has gone off her medications in the past.
>
> It is therefore not clear whether she is following through as well as possible psychiatrically, whether she is benefitting from medication as much as possible, whether she is stabilized psychiatrically as well as possible, etc. Perhaps DDS has that information on record.
>
> It is noteworthy that she did poorly on cognitive testing until she believed it was in her best interest to do better. Then she improved and answered questions she was ostensibly unable to answer earlier.

(Tr. 486-87.) Dr. Dhanens diagnosed probable PTSD, r/o borderline personality; and history of episodic alcohol abuse, binge drinking. (Tr. 487.) Dr. Dhanens assessed, *inter alia*, that he did not believe that Ms. Perea would attend work reliably day after day, arrive prepared to work, remain at a workstation, focus on tasks, or tolerate stress or frustration. (*Id.*) He further concluded that he saw "no realistic prospect of her working, but it [was] difficult to tell what particular diagnosis to attribute this to." (*Id.*)

The ALJ accorded Dr. Dhanens' assessment little weight. (Tr. 21.)

### 2. State Agency Nonexamining Psychological Consultant Julian Lev, Ph.D.

On March 11, 2014, State agency nonexamining psychological consultant Julia Lev, Ph.D., reviewed the available medical evidence record.[26]  (Tr. 70-71, 73-74.)  She assessed that Ms. Perea had no limitations other than she was *moderately limited* in her ability to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 74.)  Dr. Lev assessed that Ms. Perea could "perform simple routine work-related tasks in a normal workday/workweek in a work situation that requires no more than occasional contact with others."  (*Id.*)

The ALJ accorded Dr. Lev's assessment great weight.  (Tr. 20-21.)

### 3. State Agency Nonexamining Psychological Consultant Howard G. Atkins, Ph.D.

On August 6, 2014, State agency nonexamining psychological consultant Howard G. Atkins, Ph.D., reviewed the available medical evidence record at reconsideration.[27]  (Tr. 83-84, 87-88.)  Dr. Atkins assessed that the evidence at reconsideration did not show any significant change to Ms. Perea's mental condition.  (Tr. 88.)  He affirmed Dr. Lev's assessment that Ms. Perea could "perform simple routine work-related tasks in a normal workday/workweek in a work situation that requires no more than occasional contact with others."  (*Id.*)

The ALJ accorded Dr. Atkins's assessment great weight.  (Tr. 20-21.)

---

[26] Dr. Lev reviewed the July 2013 psychiatric hospital admission records following Ms. Perea's suicide attempt by overdosing on medication (Tr. 370-75); Carol Hunter, Ph.D., CNP's October 7, 2013, psychiatric evaluation (Tr. 410-17); and Dr. Dhanens' March 3, 2014, psychological consultative exam (Tr. 483-87).  (Tr. 70-71.)

[27] Dr. Atkins reviewed the July 2013 psychiatric hospital admission records following Ms. Perea's suicide attempt by overdosing on medication (Tr. 370-75); Carol Hunter, Ph.D., CNP's October 7, 2013, psychiatric evaluation (Tr. 410-17); Dr. Dhanens' March 3, 2014, psychological consultative exam (Tr. 483-87); Kenneth Yamamoto, M.D.'s May 14, 2014, physical exam notes (Tr. 630-31); and Deby Alvarado, LMSW's May 5, 2014, Clinical Assessment (Doc. 439-49).  (Tr. 84.)

### 4. Joseph Frechen, M.D.

On March 16, 2015, Joseph Frechen, M.D., of Valle Del Sol, completed a number of forms related to Ms. Perea's mental status on her behalf. (Tr. 500-04.) One of the forms Dr. Frechen completed was a *Questionnaire*. (Tr. 500-02.) Dr. Frechen noted therein (1) the dates on which he had treated Ms. Perea;[28] (2) her diagnoses;[29] (3) the objective bases for her diagnoses;[30] (4) the treatment provided and referred;[31] (5) prescribed medications;[32] and (6) his recommendation and treatment plans.[33] (Tr. 500.) Dr. Frechen completed an *Analysis of the Criteria for Affective Disorder Under § 12.04*, and indicated that Ms. Perea met the Part A and Part C criteria for that Listing. (*Id.*) He also indicated that Ms. Perea had moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and four or more episodes of deterioration or decompensation. (Tr. 502.) Finally, Dr. Frechen completed a *Mental Residual Functional Capacity Assessment* and assessed that Ms. Perea had *moderate limitations* in her ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) make simple work-related decisions; (5) interact appropriately with the general public; (6) ask simple questions or request assistance; (7) maintain socially appropriate behavior and to adhere to basic

---

[28] Dr. Frechen noted January 5, 2015; February 2, 2015; and March 16, 2015. (Tr. 500.) He commented that prior to this, Ms. Perea was being seen by Dr. Carol Hunter. (*Id.*)

[29] Dr. Frechen noted PTSD and Bipolar Disorder. (Tr. 500.)

[30] Dr. Frechen noted (1) recurrent intrusive thoughts; (2) nightmares; (3) mood instability; and (4) easily startled – vigilant. (Tr. 500.)

[31] Dr. Frechen noted medication management and 1:1 weekly therapy. (Tr. 500.)

[32] Dr. Frechen noted Topiramate, Buspirone, Citalopram, and Clonazepam. (Tr. 500.)

[33] Dr. Frechen noted continue present treatment. (Tr. 500.)

standards of neatness and cleanliness; and (8) be aware of normal hazards and take appropriate precautions. (Tr. 503-04.) He assessed Ms. Perea had *moderate/marked limitations* in her ability to (1) accept instructions and respond appropriately to criticism from supervisors; and (2) respond appropriately to changes in the work setting. (Tr. 504.) Finally, Dr. Frechen assessed that Ms. Perea had *marked limitations* in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with our proximity to others without being distracted by them; (7) complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) travel in unfamiliar places or use public transportation; and (10) set realistic goals or make plans independently of others. (Tr. 503-04.)

The ALJ accorded Dr. Frechen's assessment little weight. (Tr. 21.)

### 5. <u>Jennifer Cady, LPCC</u>

On March 17, 2015, Jennifer Cady, LPCC, of Valle Del Sol, completed a number of forms related to Ms. Perea on her behalf. (Tr. 506-12.) One of the forms she completed was a *Questionnaire* in which she noted (1) the dates Ms. Perea had treated at Valle Del Sol;[34] (2) Ms. Perea's diagnoses;[35] (3) the objective bases for her diagnoses;[36] (4) the treatment

---

[34] LPCC Cady noted that Ms. Perea began treatment with Valle Del Sol on January 1, 2013, for PTSD and Bipolar Disorder. (Tr. 506.) She also noted that Ms. Perea was treated at La Buena Vida in the 1990's for the same conditions. (*Id.*)

[35] LPCC Cady noted PTSD and Bipolar Disorder. (Tr. 506.)

provided and referred;[37] (5) prescribed medications;[38] and (6) her recommendation and treatment plans.[39]  (Tr. 506.)  LPCC Cady completed an *Analysis of the Criteria for Affective Disorder Under § 12.04*, and indicated that Ms. Perea met the Part A criteria of that Listing.  (Tr. 508.)  She also completed a § 12.06 *Anxiety Related Disorder* form and indicated Ms. Perea met the Part A and Part C criteria of that Listing.  (Tr. 509.)  LPCC Cady also indicated that Ms. Perea had moderate restrictions in her activities of daily living; marked restrictions in maintaining social functioning; extreme restrictions in maintaining concentration, persistence or pace; and three repeated episodes of deterioration or decompensation.  (Tr. 510.)  Finally, LPCC Cady completed a *Mental Residual Functional Capacity Assessment* and assessed that Ms. Perea had *moderate limitations* in her ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (8) respond appropriately to changes in the work setting.  (Tr. 511-12.)  LPCC Cady also assessed that Ms. Perea had *marked limitations* in her ability to (1) maintain attention and concentration for extended periods; (2) interact appropriately with the general public; (3) ask

---

[36] LPCC Cady noted (1) anxiety; (2) sleep disturbance; (3) intrusive memories; (4) flashbacks; (5) avoidance; (6) relationship disturbances; (7) hypervigilance; and (8) anger dyscontrol.  (Tr. 506.)

[37] LPCC Cady noted emotional regulation and that she is concurrently enrolled in anger management.  (Tr. 506.)

[38] LPCC Cady noted none.  (Tr. 506.)

[39] LPCC Cady noted "[c]ontinue weekly individual therapy for emotional regulation."  (Tr. 506.)

simple questions or request assistance; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) travel in unfamiliar places or use public transportation. (*Id.*)

The ALJ accorded LPCC Cady's assessment no weight. (Tr. 21.)

**D.      The ALJ Failed To Properly Weigh the Medical Source Opinion Evidence Related to Ms. Perea's Mental Impairments**

Ms. Perea argues that the ALJ's explanation for according Dr. Dhanens' opinion little weight was conclusory. (*Id.* at 12.) She further argues that in according great weight to the State agency nonexamining psychological consultant assessments, the ALJ failed to consider that their assessments were made before the majority of the evidence was entered into the record. (Doc. 20 at 14.) Ms. Perea asserts that the ALJ failed to properly weigh Dr. Frechen's opinion as a treating physician and failed to demonstrate how his opinion was inconsistent with the record as a whole. (*Id.* at 11.) She also asserts that the ALJ failed to properly weigh LPCC Cady's opinion pursuant to SSR 06-3p. (*Id.* at 12-13.) The Commissioner argues that it was reasonable for the ALJ to rely upon the State agency psychologists' opinions, particularly in light of the concerns she expressed regarding the other psychological opinions of record. (Doc. 22 at 20-21.) The Court concludes that the ALJ failed to properly weigh the medical opinion evidence related to Ms. Perea's mental impairments for the reasons discussed below.[40]

**1.      Dr. Dhanens**

In according little weight to Dr. Dhanens' opinion, the ALJ explained that his opinion was conclusory and provided very little explanation of the evidence relied on in forming his

---

[40] The standard for evaluating and weighing medical opinion evidence was previously stated in this opinion and will not be repeated here. *See* Section III.B., *supra.*

opinion that Ms. Perea "would be an unstable and unreliable employee." (Tr. 21.) The ALJ further explained that Dr. Dhanens did not document positive objective clinical or diagnostic findings to support his functional assessment. (*Id.*) The ALJ's explanation is not supported by substantial evidence. In his consultative report, Dr. Dhanens extensively described Ms. Perea's reported relevant histories and noted his mental status exam findings. (Tr. 484-85.) He also indicated his review of Ms. Perea's records from her recent hospitalization following an "impulsive suicide gesture." (Tr. 486.) Based on his intake and observations, Dr. Dhanens provided a detailed and lengthy "impression" of Ms. Perea's mental status (*see* Section III.C.1., *supra*), wherein he concluded that she had very "significant characterological problems" and "significant mood disorder and behavioral acting-out." (Tr. 486.) This constitutes specific clinical findings. *See Robinson*, 366 F.3d at 1083 (explaining that a psychological opinion may rest either on observed signs and symptoms or on psychological tests). Dr. Dhanens also diagnosed probable PTSD, r/o borderline personality, and history of episodic alcohol abuse. (Tr. 487.) Although Dr. Dhanens stated it was difficult to attribute Ms. Perea's mental functional limitations to a particular diagnosis, he nonetheless assessed that the vocational implications of Ms. Perea's mental status were that "regardless of the specific diagnosis, this clearly is a dysfunctional woman who would be an unstable, unreliable employee." (Tr. 487.) The ALJ's characterization of Dr. Dhanens' opinion as conclusory and lacking explanation is not supported by the record.

### 2.    Dr. Lev and Dr. Atkins

In according great weight to the State agency non-examining psychological assessments, the ALJ explained that Dr. Lev's and Dr. Atkins' assessments were reliable because they had reviewed the record, including Dr. Dhanens' report and claimant's statements regarding her daily

activities, and their assessments were consistent with the record as a whole. (Tr. 21.) The ALJ's explanation is not supported by substantial evidence. First, the ALJ failed to point to any specific evidence to demonstrate that their assessments were consistent with the record as a whole. This is significant here because the Court's review of the record demonstrates that *all* of the other medical opinion evidence in the record related to Ms. Perea's mental impairments; *i.e.,* Dr. Dhanens' assessment, Dr. Frechen's assessment, and LPCC Cady's assessment, is *inconsistent* with Dr. Lev's and Dr. Atkins' assessments regarding Ms. Perea's ability to do work-related mental activities. Moreover, the other medical record evidence is from treating and/or examining medical sources and generally would be entitled to more weight. *See Robinson*, 366 F.3d at 1084. Additionally, the ALJ failed to show that she considered the incomplete medical record evidence reviewed by the State agency consultants or the relative age of their opinions in comparison to the other medical opinion evidence in the record related to Ms. Perea's mental health impairments. *See generally Jaramillo v. Colvin*, 576 F. App'x 870, 874 (10th Cir. 2014) (noting the significance of a recent physician's examination which found more limitations than an examination by another physician two years prior). The ALJ's explanation for according great weight to the State agency non-examining psychological consultant opinions is not supported by substantial evidence.

### 3.  **Dr. Frechen**

The ALJ accorded little weight to Dr. Frechen's treating physician opinion. The ALJ explained that Dr. Frechen offered no clinical findings to support his assessed functional limitations. (Tr. 21.) The ALJ also stated that Dr. Frechen's assessment that Ms. Perea was "disabled" was an issue reserved to the Commissioner and was inconsistent with the overall evidence of record. (*Id.*) As an initial matter, the ALJ erred in failing to apply the treating

physician rule in evaluating Dr. Frechen's opinion. This is error. *Langley*, 373 F.3d at 1119. The ALJ's explanations for rejecting Dr. Frechen's opinion are also not supported by substantial evidence.

On March 16, 2015, Dr. Frechen completed several forms on Ms. Perea's behalf including a "checklist-style" *Mental Residual Functional Capacity Assessment*, and a *Questionnaire*. (Tr. 500, 503-04.) In the *Questionnaire*, Dr. Frechen noted diagnoses of PTSD and Bipolar Disorder, and indicated signs and symptoms of recurrent intrusive thoughts, nightmares, mood instability, and that Ms. Perea was easily startled and vigilant. Viewing the forms together, it is clear that Dr. Frechen offered clinical findings to support his assessed functional limitations of Ms. Perea's ability to do work-related mental activities. (Tr. 500.) Further Dr. Frechen did not opine that Ms. Perea was "disabled." Rather, Dr. Frechen assessed that Ms. Perea met the Part A and Part C criteria for Listing 12.04 – *Affective Disorder*. (Tr. 501.) While the ALJ is correct that it is the Commissioner's responsibility to decide a claimant's RFC based on all of the medical findings and evidence, the ALJ is nonetheless required to consider opinions from medical sources on issues such as whether an impairment meets or equals the requirements of any impairment in the Listing of Impairments. 20 C.F.R. 416.927(d)(2). The ALJ failed to do so here. The ALJ also failed to point to any specific evidence demonstrating that Dr. Frechen's opinion was inconsistent with the overall evidence. This is significant here because the Court's review of the record demonstrates that all of the medical source evidence from other treating and/or examining sources; *i.e.,* Dr. Dhanens' assessment and LPCC Cady's assessment, is *consistent* with Dr. Frechen's opinion.

### 4. LPCC Cady

The ALJ gave LPCC Cady's assessment no weight, explaining that LPCC Cady completed a "checklist-style form" that appeared to her to have been completed "as an

accommodation to the claimant," which included only conclusions regarding functional limitations without any rationale for those conclusions. (Tr. 21.) In so doing, the ALJ failed to apply the correct legal standard in weighing LPCC Cady's assessment pursuant to SSR 06-03p. Furthermore, her explanations for according LPCC Cady's assessment no weight are not supported by substantial evidence.

The regulations contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)). Recognizing the growth of managed health care in recent years and the increasing use of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinion from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3. Thus, evidence from other medical sources[41] and non-medical sources[42] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2. "Information from these 'other sources' cannot establish the existence of a medically

---

[41] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2.

[42] Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2.

determinable impairment. Instead, there must be evidence from an 'acceptable medical source'[43] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may still properly determine that opinions from such sources are entitled to greater weight than a treating source medical opinion. SSR 06-03p, 2006 WL 2329939, at *6. The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5.

Here, although the ALJ cited the relevant Social Security ruling for evaluating and weighing other medical source opinion evidence, she failed to demonstrate that she considered or

---

[43] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1.

applied the relevant factors in evaluating and weighing LPCC Cady's assessment. *See* SSR 06-03p, 2006 WL 2329939, at *2-6. This is error. Additionally, the ALJ's explanations for according no weight to LPCC Cady's assessment are not supported by substantial evidence. On March 17, 2015, LPCC Cady completed several forms on Ms. Perea's behalf, one of which was "checklist-style" *Mental Residual Functional Capacity Assessment*, and another of which was a *Questionnaire*. (Tr. 506, 511-23.) In the *Questionnaire,* LPCC Cady clearly indicated Ms. Perea's diagnoses of PTSD and Bipolar Disorder, and noted signs and symptoms of anxiety, sleep disturbance, intrusive memories, flashbacks, avoidance, relationship disturbance, hypervigilance, and anger dyscontrol. (Tr. 506.) Thus, LPCC Cady provided clinical findings to support her assessed functional limitations of Ms. Perea's ability to do work related mental activities. Moreover, the ALJ provided no basis on which to conclude that LPCC Cady completed these forms only as an accommodation to Ms. Perea, nor is this an appropriate reason for rejecting LPCC Cady's assessment. *See generally McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("an ALJ's assertion that a family doctor naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician"). LPCC Cady indicated that Ms. Perea began treatment at Valle Del Sol on November 1, 2013.[44] The record further supports that at the time LPCC Cady completed the assessment forms on Ms. Perea's behalf, Ms. Perea had been regularly evaluated and treated by various Valle Del Sol mental healthcare providers, including LPCC Cady, for approximately eighteen months. (Tr. 395-404, 404-09, 439-49, 460-62, 500-504, 506-12, 513-24, 525-28, 529-34, 597-600.) As such, the ALJ's explanation that LPCC Cady completed these forms as an accommodation is not supported and is mere speculation. *See generally McGoffin*, 288 F.3d at 1252 (an ALJ may not make speculative

---

[44] The Administrative Record demonstrates that Ms. Perea was initially assessed at Valle Del Sol on August 27, 2013. (Tr. 395-407.)

inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgment, speculation or lay opinion).

For all of the foregoing reasons, the ALJ improperly evaluated and weighed the medical source evidence related to Ms. Perea's mental impairments.

### F.    The Court Will Remand for Additional Administrative Proceedings

In her Reply, Ms. Perea argues for the first time that the Commissioner's decision should be reversed for an immediate award of benefits.[45]   (Doc. 23 at 7-8.)  She explains that she was found to be disabled and awarded benefits based on a subsequent SSI application filed March 29, 2017.  (*Id.*)  Ms. Perea asserts that because additional fact finding would serve no useful purpose, an outright reversal and award of benefits is appropriate.   (*Id.*)   The Court does not agree. District courts have discretion to remand either for further administrative proceedings or for an immediate award of benefits.  *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993).   In making this decision, courts should consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits.'"  *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (quoting *Harris v. Sec'y of Health & Human Servs*., 821 F.2d 541, 545 (10th Cir. 1987)).   This matter has not been pending for an unreasonable period of time.  Additionally, the Court is not persuaded that remand for additional fact-finding would merely delay the inevitable receipt of benefits.  The Court is therefore remanding for additional administrative proceedings.

---

[45] Because the Court does not agree with Ms. Perea's request for immediate awards, there is no need for the Commissioner to provide a surreply.

## E.     Remaining Issues

The Court will not address Ms. Perea's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.  Conclusion

For the reasons stated above, Ms. Perea's Motion to Reverse or Remand (Doc. 19) is **GRANTED.**

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**